## FRENCH *v.* MARSTIN.

A right of way over the land of another to a particular close, cannot be enlarged and extended to other adjoining closes.

M. owned what he called his " Mountain pasture," consisting of the Bean, the Brown and the Sheafe lots. He contended that he had the right of way to this pasture over the land of F., but there was no evidence that he had any such right to the Brown and Sheafe lots.—*Held*, that, notwithstanding he might have the right to cross the land of F. to go to the Bean lot, and notwithstanding the three lots might all be embraced in one pasture, he could not extend the right to the other lots, and that in crossing the land of ·F. to go to the " Mountain pasture" he would 'be a trespasser, and that F. would have the right to use sufficient force to prevent his crossing.

TRESPASS, for an assault and battery upon the plaintiff, on the 26th day of June, 1849. The writ was dated on the 29th of June, 1849.

Plea, the general issue, with a brief statement, that at the time of the alleged assault the defendant was lawfully possessed of a tract of land in Sutton, (describing it,) containing seventy-five acres, and the plaintiff, without the license and against the will of the defendant, broke and entered the close, and trod

down the grass, &c.; that the defendant requested him not to enter the close, and to depart from it, which he refused to do, and thereupon the defendant gently laid his hands upon him and removed him from the close, as he had a right to do, using no more force than was necessary for that purpose.

The question in the case was whether the plaintiff had a right of way across the land of the defendant.

Lot No. 14, to which reference is made in this case, lies north of lot 54.

The plaintiff offered evidence that on the 27th of March, 1811, Nathan Phelps conveyed to John Phelps a piece of land in Sutton, described as " beginning on the east line of said lot, about three rods south of the path now trod to my house in Wilmot, at a stake, making a right angle with the east line by running west five rods to a stake; thence north, on a parallel line with the east line, eight rods, to a stake; thence east, five rods, to the east line to a stake; thence on the east line, eight rods, to the bound first mentioned; to contain a quarter of an acre by measure, reserving to myself the right of never being obliged to allow a public road crossing my land to the above premises for the accommodation of said John, his heirs or assigns, yet said John shall always, at all times, have a privilege of a drift or bridle road through my land to the described premises."

The defendant contended that by this deed no other right was conveyed to John Phelps than a right personal to himself.

The quarter acre was fenced off in the year 1811, and included in the land occupied by John Phelps. On the north side of it was a stone wall; on the west was a wall to a set of bars, and from thence there was a stone and wood fence.

On the 20th of February, 1826, John Phelps conveyed to Moses Smith lot No. 54. On the same day John Phelps and wife conveyed to Moses Smith the quarter acre, " reserving to Nathan Phelps the same privileges reserved in the deed of Nathan Phelps to John Phelps," and referring to that deed for farther particulars. On the 15th of March, 1826, Moses Smith conveyed lot No. 54 to Reuben Bean, and also the quarter acre,

" being the same that Nathan Phelps conveyed to John Phelps for a bridle road," and referring to that deed. On the 30th of March, 1831, Reuben Bean conveyed lot No. 54 to the plaintiff, and also the quarter acre. All these deeds contained general covenants of warranty, and conveyed the premises described therein, with the privileges and appurtenances.

Both parties derived their title from Nathan Phelps. The defendant offered in evidence a deed from Gideon Wilkins and Nathan Phelps to John Phelps, dated on the 31st of October, 1810, conveying part of lot No. 13, now in Wilmot, formerly Kearsarge Gore, describing it to contain thirty acres. Also, a deed from Nathan Phelps to Nathan Phelps, Jr., dated in July, 1832, and conveying one half of the Nathan Phelps farm. On the 6th of July, 1832, Nathan Phelps conveyed to Ira Phelps one undivided half of " the homestead farm I now live on," which was described as bounded east on Wilmot line. On the 11th of February, 1837, Nathan Phelps, Jr., conveyed to Ira Phelps the easterly half of the Nathan Phelps farm, bounded north on Wilmot line. On the 2d day of April, 1837, Ira Phelps conveyed to Ephraim Marstin the easterly half of the Nathan Phelps farm, by the same description as in the preceding deed. On the 8th of September, 1837, Ephraim Marstin conveyed the same premises to the defendant. Neither of these deeds contains any reservation of the quarter acre, nor of any right of way.

The plaintiff acquired his title to the Brown lot and the Sheafe lot in the years 1847 and 1848.

The plaintiff offered evidence that John Phelps moved upon lot 54 in the year 1808, and lived there eighteen years, until 1826, when he 'sold it to Moses Smith; that he usually went from his farm in a south-west direction, through the field of Nathan Phelps, and came into the road that passed between Phelps' house and barn. In the year 1811 the quarter acre was fenced off from the farm of Nathan Phelps and included in that of John Phelps. The way commenced about the middle of his farm, and went through the quarter acre. In the year 1808 there

was a trodden path all the way through the fields from the road in Sutton to the farm, which was used for a road, although it was not worked as highways usually are. It was used for the purpose of traveling from the farm to the road, to the school-house, for teams of all kinds, for the purpose of drawing hay, &c., and there was no other mode of getting to the public highway. About forty-five years ago Nathan Phelps cleared some land between his house and John Phelps' land, and when he did so he straightened the way across the new piece, but John Phelps testified that no other alteration was ever made in the way, to his knowledge. After the year 1811 John Phelps worked out all his taxes on the way, laid up stones on the north side of it in one place, and plowed and leveled it down. Nathan Phelps also did some work on the way, as he wished to draw his hay and manure upon it. No objection was made by any person to the use of the way by John Phelps, and he claimed the right to use it by virtue of the deed of the road and of the quarter acre from Nathan Phelps. Reuben Bean, a witness for the plaintiff, who lived on lot 54 from 1826 to 1831, stated that he used the way, claiming the right to do so ; that it was about twelve feet wide ; that it was passable, and he used it for carts, sleighs, wagons, &c. ; that it was called a bridle road, and was rather steep, but pretty smooth, and that he worked out his taxes on it by a vote of the town, and Ira Phelps worked some on it, summer and winter.

It appeared that for four years previous to the year 1808 the farm was occupied by Frederick Wilkins, who built a log house upon it. John Phelps testified that Wilkins used to pass through Nathan Phelps' field by this way, and that he (the witness) often went to Wilkins' house by this way. In the year 1826 Reuben Bean went to live on lot 54, and remained there until the year 1831. From his testimony, which was cumulative to that of John Phelps, and similar to it in its material points, it appeared that he used the way, claiming a right to do so by virtue of his deed from Moses Smith.

Upon the Bean lot, which is No. 54, there is a house contain-

ing four or five rooms below, which are finished. There was also a barn, which was removed before the year 1849, and an orchard, containing over a hundred apple trees. After the year 1831 the house was occupied by several tenants successively. In the year 1841 the way was used by a witness, who passed over it several times with his cattle, which were pastured for him by the plaintiff.

It appeared that the plaintiff owned what he called his Mountain pasture, consisting of the Bean, the Brown and the Sheafe lots. The Brown and Sheafe lots he had owned about eight or ten years, and these were occupied only as pastures. The Bean lot was divided by fences into three pastures, called the Orchard and the North and South pastures. The South pasture and the Sheafe lots were pastured all the season, and sheep could run from the Bean to the Sheafe lots, and they generally ran in the Sheafe and Brown lots. In the year 1849 there was no fence between the South pasture, which includes also a part of the Sheafe lot and the Bean lot. On the 26th of June, 1849, the sheep were in the South pasture, and the evidence was that on that day the fracas occurred while the plaintiff was passing over the way in question, on the land of the defendant, to salt his sheep in his Mountain pasture, into the south part of which the plaintiff went accordingly and called the sheep together.

The defendant resisted the plaintiff's passing altogether, and it did not appear that he resisted it upon the ground that the plaintiff was going to lots beyond the Bean lot. The defendant refusing to let him pass, the plaintiff tendered him ten cents, which the defendant put into his pocket and said, " Very well, you may go this time." The plaintiff told him to remember what it was, for he would have to pay it back. The defendant then said to the witness, " Your father says I shall have to pay it back, and we'll see about that," and then suffered the plaintiff to pass. About a week before this, while the plaintiff was proceeding to drive his sheep over the way, something was said by the defendant about the plaintiff's crossing down and back for fifty cents. The plaintiff asked if he would trust him, and he said he

would. When the plaintiff returned the defendant said, " recollect there are twenty-five cents to pay whenever you drive anything across my land ;" and the plaintiff said, " the next thing is to get it." The same afternoon the plaintiff told the witness he had paid the defendant fifty cents.

The defendant offered evidence that in the year 1844 he plowed up a part of the way, declaring at the time that he did so to keep the plaintiff from passing over his land, as he had done before, and that in the year 1845 he forbade one Peaslee, who was in the employ of the plaintiff, and who was passing over his land to the Mountain pasture, to go over his land, threatening to prosecute any person who did so. In the year 1841 he told the plaintiff he should not drive his sheep or any other animals over his land.

The evidence was, that up to the month of May, 1831, the way went south of a certain knoll, and that the path at the gate where the assault was made first began to be traveled in the year 1830.

The defendant contended that John Phelps had no title to lot 54 but by possession, and that he must have had a title to the lot either by adverse possession, or in some other way, before he could acquire a right of way to it by prescription ; that if there ever was any right of way, it was only to the quarter acre, and could not be used for the purpose of going beyond it, and that on the 26th of June the plaintiff was using the way for the purpose of going beyond the quarter acre, and did actually go beyond it ; that no right of way could be claimed by prescription, because those claiming such right derived their title from the deed of 1811 from Nathan Phelps to John Phelps ; that they are bound by the deed which appeared in the case, and by the grant therein of the right of way, and cannot set up any right in opposition to the grant ; that the case shows that John Phelps had no title but by possession for eighteen years to lot 54, and that those who claim under him had no title nor color of title to lot 54 until the year 1826, since which time the use of the way has been interrupted ; that admitting the plaintiff had a title to a

French *v.* Marstin.

way by prescription to lot 54, he had no right to use the way for the purpose of going beyond that lot to the Brown and Sheafe lots, or for purposes connected with lands beyond that lot, and that, as the plaintiff did not reside upon lot 54, he had no right to make use of the whole lot as a pasture, thereby increasing his travel over the way, because that would enlarge the right and impose a greater burthen on the defendant; and that at the gate where the fracas occurred the way had not been used a sufficient length of time, being only since the year 1830 or 1831, to constitute a title by prescription.

The court being of opinion that the action could not be maintained, directed a verdict for the defendant, upon which judgment is to be rendered, or it is to be set aside and judgment rendered for the plaintiff for $13.34, as the court may order.

*Bellows,* for the plaintiff.

John Phelps' possession was sufficient to entitle him or his assigns to maintain this action. He and his assigns have occupied this farm and used this way without interruption from 1808 to 1844, except in 1841, as to sheep and cattle. The use was for all farming purposes. It is presumed to be adverse. *Miller* v. *Garlock*, 8 Barb. Sup. C. 153; Mathews on Presumpt. Evid. 324.

The deed from Nathan Phelps to John Phelps, in 1811, does not rebut the presumption of adverse possession, if, as the plaintiff contends, it conveys a right of way only to the quarter acre; for Phelps might have a right of way to lot 54 and still no right of way to the quarter acre, — just the same as if the quarter acre was on the opposite side of lot 54; so that purchase of a right of way to the quarter acre would not recognize the grantor's right to control the way to 54. As a matter of law, then, this deed does not rebut the presumption of adverse user, but the question is peculiarly one of fact for the jury. So the presumption of a grant is not rebutted by showing an imperfect or unexecuted grant. *Bolivar* v. *Neponset Mill Co.*, 16 Pick. 241. So a negotiation to purchase a right already acquired by pre-

scription will not affect the right so acquired. Angell on Water-courses 231; *Watkins* v. *Peck*, 13 N. H. 368.

If the adverse user begins at the date of the deed, March 27, 1811, the title became perfect March 27, 1831. No interruption until 1841 — no change at place of affray till May, 1831, and so after the expiration of twenty years.

A right of way to lot 54 was then acquired by prescription on March 27, 1831. The change at the place of the affray was, by consent of all parties, a substitute of the new for the old; and a subsequent use of the new for at last ten or twelve years. This is a dedication of the new way. *Lernerd* v. *Lernerd*, 11 Met. 421; *Hamilton* v. *White*, 4 Barb. Sup. Ct. 60. It is for the jury to say whether the new was designed to be a permanent substitute for the old. Nor is time an essential element in determining what is dedication. 2 Greenl. Evid., § 622; *Jarvis* v. *Dean*, 3 Bing. 447; *Woodyer* v. *Hadden*, 5 Taunt. 137; *Prichard* v. *Atkinson*, 4 N. H. 1. Dedication may be a limited one; *Marquis of Strafford* v. *Coqueney*, 7 B. & C. 257; *Blundelle* v. *Catheal*, 5 B. & A. 268; *Hobbs* v. *Lowell*, 19 Pick. 405. So if the user had been less than twenty years, and a change made to straighten the way by act of both parties, it would not affect the prescription. *Hall* v. *Swift*, 6 Scott 167; Angell on Watercourses, § 242, 243.

A plaintiff can enlarge a grant by prescription. *Wendell* v. *Moulton*, Grafton Co.; *Atkinson* v. *Boardman*, 20 Pick. 291; *Hamilton* v. *White*, 4 Barb. Sup. Ct. 60; *Miller* v. *Garlock*, 8 ditto 153.

The grant was not limited to John Phelps, but extended to his heirs and assigns. The grant of the way is as much to his heirs and assigns as the quarter acre itself.

It was for the jury to say, upon all the evidence in the case, whether the plaintiff was using the way to go beyond lot 54. He was going to salt the sheep that were then on 54, although they had access to lots beyond.

The evidence tended to prove that he did not go beyond 54, and salted his sheep there. It appeared, also, that the sheep

---
---

were turned into this pasture the week before, with the defendant's consent, and if so, were rightfully put there ; and it was a matter of fact for the jury to say what was his purpose, for he might have been using the way to go to 54 rightfully.

It is to be observed, too, that the defendant did not at the time put his objection on the ground that the plaintiff was intending to go beyond 54, but denied his right to the way altogether.

We do not yield the point that the deed to John Phelps gives a right of way to No. 54, but shall undertake to maintain that position, should it become material.

*Tappan*, for the defendant.

I. The only right of way attempted to be shown by grant (and we say the only one shown at all,) is the right set up by virtue of the deed from Nathan Phelps to John Phelps, of the *quarter acre*, dated March 27, 1811, which, as we contend, was by the very terms of the grant intended only as a personal privilege to John Phelps. The grant of a drift or bridle road is to John alone.

II. But whether this be so or not, if the deed gives an unqualified right of way to the grantor and his assignees, it is only to the quarter acre. There is no right granted to go beyond it.

The case finds that the plaintiff was using the way to go to the other lands beyond the quarter acre, which was a misuser of the way.

That the grantee cannot go out of the limits of his way, nor use it to go to any other place than that described, nor to that place for any other purpose than that specified, is already settled by the opinion of the Superior Court in this case. 4 Foster 440 ; see, also, Woolrych on Ways 27–34 ; 1 Co. Litt. (Thomas' Edition) 189 ; *Davenport* v. *Lamson*, 21 Pick. 74.

This whole controversy grows out of the attempt, on the part of the plaintiff, to enlarge the right of way (whatever it was,) originally granted to the small lot of one fourth of an acre, and make it apply, not only to the quarter acre and to the lot 54, (in Bean lot,) but to the Brown and Sheafe lots, and all other lands

he may see fit to purchase and use as pasturage, thereby subjecting the defendant's farm to a burden which lessens its value at least one half.

III. But the plaintiff undertakes to claim a right to go beyond the quarter acre by prescription. In order to sustain this right he must show an uninterrupted user under a claim of right, for the period of twenty years. *Odiorne* v. *Wade*, 5 Pick. 421 ; *Sargent* v. *Bullard*, 9 Pick. 254 ; *Hill* v. *Crosby*, 2 ditto 467, and note ; *Bolivar Manufacturing Co.* v. *Neponset*, 16 Pick. 241 ; *Gray* v. *Bartlett*, 20 Pick. 186 ; *Pritchard* v. *Brown*, 4 N. H. 12. To this claim by prescription we reply :

1. The only prescription that can be claimed is a prescription in a *que estate ;* that is, in the plaintiff and those whose estate he holds. Such a prescription must always be laid in him that is tenant of the fee. 4 Foster 440 ; 2 Bl. Com. 265 ; 2 Thos. Ed. Co. Litt. 204, and notes ; Hilliard's Elements of Law 197.

If this be correct doctrine, the plaintiff does not show, either by himself or by those under whom he claims, an uninterrupted possession for a sufficient length of time to raise the presumption of a grant.

The plaintiff at best cannot commence his right by prescription until February, 1826, the time when John Phelps sold to Moses Smith. Until that time there were no persons owning in fee, or by any colorable title even claiming a right of way to lot 54.

Since 1826, as the case finds, the right of way has been the subject of contest and dispute, and has been repeatedly interrupted. No period of twenty years between that time and the date of the alleged trespass, or the commencement of this suit, has elapsed without such interruption. *Odiorne* v. *Wade*, 5 Pick. 421. It was interrupted in 1841, and again in 1844. *Barker* v. *Clark*, 4 N. H. 380 ; and again in 1845.

2. But admitting that the plaintiff, and those under whom he claims, have used the way here interruptedly for twenty years, such user does not give an absolute right, but is merely presumptive evidence of a grant, which is liable to be rebutted and controlled by other evidence. And we contend that all the facts

and circumstances in this case go to rebut any such presumption, and are entirely inconsistent with a grant of way to lot 54. That twenty years' uninterrupted possession of an easement is merely *presumptive evidence of a grant*, which presumption may be rebutted and shown to be inconsistent with the fact of a grant, seems to be too well settled to be questioned. 3 Kent's Com. 445; *Barker* v. *Clark*, 4 N. H. 380; 3 Phil. Cowen's Ev. 195; *Watkins* v. *Peck*, 3 N. H. 377; *Arnold* v. *Stevens*, 24 Pick. 110; *Pritchard* v. *Atkinson*, 4 N. H. 12; *Greely* v. *Quimby*, 2 Foster 338.

To apply these authorities to the present case: Not only are the circumstances perfectly consistent with the non-existence of a grant, but it is shown conclusively that there is no grant of a way to lot 54, nor to any land beyond the quarter acre. In the language of the authorities, the " presumption of title" to a way to that lot is " fully and fairly destroyed."

In order to constitute a way by prescription it is necessary, not only that it should be occupied for a sufficient length of time, but the user must also be under a claim of right, which was not done here.

3. But from the facts disclosed in this case there can be no presumption in opposition to the grant set up. The plaintiff must be confined to the grant by virtue of which the right is claimed, and cannot show a prescription in opposition to it. 3 Phil. Cow. Ev. 545; *Boynton* v. *Rees*, 8 Pick. 329. And on the trial of this case it appeared that the way was claimed by virtue of a grant.

4. But another, and a complete answer to the plaintiff's case by prescription, is found in the fact that at the gate where the alleged trespass took place no way has been travelled for a period of twenty years. The alleged trespass took place June 26, 1849, and the writ is dated June 29, 1849. Supposing that the plaintiff commenced travelling at the gate even as early as the first day of January, 1830, twenty years would not have elapsed till January 1, 1850. The way still continued to run " south of the knoll," and in another place from the gate, up to May, 1831.

5. But if any prescriptive right has ever been acquired, it is to use the way in a particular manner and for a particular purpose, while the plaintiff now claims to use it for another and entirely different purpose. The right acquired, if any, was to use this way to go to lot 54, occupied as a farm. It is one thing to use a way with carts, wagons, &c., confined to a particular and well defined track, for the ordinary purposes of a farm, and quite another to turn the whole farm into a pasture, and use the way at all seasons of the year, as well when crops are growing upon the lands as when they are not; to drive his flocks and herds (sufficient to pasture the whole) across the land of another.

This is only a part of what French attempts to do in this case. The case finds that at the time of the interruption for which this suit was brought, and for a long time previous, the plaintiff, living off this lot, had turned the whole of it into a pasture, and used it all as pasturage. This, we say, is an enlargement — an increase of the burthen — at any rate, a change of whatever right had been acquired, and therefore a *misuser* of the way. " The proof of user of a right of way only establishes a right commensurate with the usage."

IV. But the defendant is not obliged to rely upon any of the preceding points. He may admit that the plaintiff had a prescriptive right of way to lot 54, and then the plaintiff cannot succeed in this case. For at the time the alleged trespass occurred he was using the way to go beyond lot 54.

The plaintiff had owned the Brown and Sheafe lots but eight or ten years, and his right was all along disputed; and if he can justify going to them or either of them at this time, he may purchase all the other lots in that vicinity, and use this way to them with perfect impunity. Woolrych on Ways 34, and authorities; *Davenport* v. *Lampson*, 21 Pick. 74.

If the plaintiff can, under all the circumstances of this case, sustain his suit; or if any principles are established which will allow him to drive his sheep and cattle to the Sheafe and Brown lots, or even to the Bean lot, it will work a severe hard-

French v. Marstin.

ship upon the defendant. And whatever of value there is left of his farm will depend more upon the forbearance which the plaintiff may exercise in purchasing other "lots," than upon any security which the defendant can feel in the protection afforded to his possession by the laws of the land.

EASTMAN, J.* Had this case been submitted to the jury under the charge of the court as to the law, several questions might have arisen which would, perhaps, have become necessary for us to decide. For instance, whether any right of way existed to lot 54, independent of the grant to John Phelps, in 1811, to the quarter acre; whether the grant was limited to John Phelps; whether the alteration in the way in 1830 or 1831, was made under such circumstances as to become a substitute for that part formerly used; and whether there was any right to use the way for driving sheep. These and other questions might have arisen. But as the case stands, the cause not having been submitted to the jury, and the facts being in dispute, we do not propose to discuss either of these questions.

There is one ground, however, which appears to us to settle the present action, whatever might be the finding of the jury or the conclusions of the court upon the other points.

There is no pretence of any right of way of any kind having been acquired by any one beyond and east of lot 54; the Bean lot, the Brown lot and Sheafe lots lying east and south of 54, and adjoining thereto, were acquired by the plaintiff in 1847 and 1848, and this suit was commenced in 1849.

It is well settled that if a person have a right of way over another's land to a particular close, he cannot enlarge it and extend it to other closes. Com. Dig., Title Chimin, D. 5; Woolrych on Ways 34; *Senhouse* v. *Christian*, 1 Term 569; *Howell* v. *King*, 1 Mod. 190; Bac. Abr., Highway, C.; *Davenport* v. *Lamson*, 21 Pick. 72; *Comstock* v. *Van Deusen*, 5 Pick. 166.

In *Davenport* v. *Lamson*, the plaintiff brought trespass against

* PERLEY, C. J., having been of counsel, did not sit.

the defendant for breaking and entering his closes, called the eight acre lot, and the Brown lot, and the defendant justified under a right of way across the lots to a three acre lot belonging to him.  It appeared that the defendant owned the three acre lot, and also a nine acre lot purchased by him subsequently to his becoming tenant of the former, and that he had a right of way to the three acre lot.  At the time of the trespass these two lots, the three acre and the nine acre, were not separated by any fence, and were one mowing field ; and the defendant, taking a load of hay, which was made up partly from each lot, proceeded from the three acre lot across the plaintiff's close ; and it was held that the defendant was liable for the trespass ; that he had no right to use the way as a way from the nine acre lot, although in so doing he passed last from the three acre lot upon the plaintiff's close, and a part of the load was taken from the three acre lot.

The doctrine of the books upon this question is undoubtedly sound.  If a right of way to one lot can be extended at will, by the tenant, to another lot that may adjoin it, then may it be extended to a third, and so on to any limits that the tenant may choose.

Admitting, then, for the purposes of this decision, and for that only, that the defendant had a right of way to lot 54, to the extent and in the manner claimed by him, and still he cannot sustain this action, for he was undoubtedly in the wrong in attempting to cross the defendant's close to go upon the Brown or Sheafe lot.

The case finds that, at the time of the alleged assault, the plaintiff was going to what he called his "Mountain pasture," which consisted of the three lots, the Bean, the Sheafe and the Brown lot, to salt his sheep, and that he actually went and called his sheep together in the South pasture, which, in that year, was formed by a part of the Bean lot and the Sheafe lot, there being no fence between these lots ; it appearing, also, that the sheep generally ran in the Brown and Sheafe lots.

Now, what was the plaintiff using the way for, when the defendant stopped him ? Not to go to the quarter acre ; not to go to the Bean lot, and salt his sheep there ; but to go to the " Mountain pasture," wherever he might find his sheep. That was his purpose, and that purpose he carried into effect. It cannot be said that his intent was only to go to the quarter acre or to the Bean lot, because the fact is stated in the case to be otherwise. The case finds that the fracas occurred while the plaintiff was passing over the way in question, on the land of the defendant, to salt his sheep in his Mountain pasture. He claimed the unrestricted right to go to the Mountain pasture. It was with that intent that he entered upon the way ; to go to any part of the pasture ; and he was in the exercise of a right which did not exist in him when the defendant interfered ; the right to go to the Mountain pasture, the whole pasture, wherever the sheep might be.

We do not see how this case can be distinguished in principle from that of *Davenport* v. *Lamson,* nor indeed from the general doctrine upon the subject ; and sufficient matters are stated in the case as facts to settle this question without submitting it to the jury.

It does not relieve the plaintiff that the defendant did not resist his passing, on the ground that he was going to lots beyond the Bean lot. No doubt both parties understood the object of the plaintiff, but the defendant was not obliged to state the reasons why he objected. If he was in the wrong, he was answerable ; and if in the right, he was not called upon to show his reason. It was quite as incumbent on the plaintiff to state that he was not going to the Mountain pasture, as for the defendant to object to his using the way on that ground.

The fact, also, that the defendant had permitted the sheep to be driven over the way to the pasture about a week before, and that he had been paid for it, does not aid the plaintiff. His going there under those circumstances gave him no right to pass over the way on the day of the trespass, nor had this fact any tendency to show a right.

When the plaintiff was on the way, using it for an unauthorized purpose — the purpose of going to the Mountain pasture to salt his sheep, wherever they might be — the defendant had the right to stop him.

The court ordered a verdict for the defendant; and upon the question which we have considered, we think they were right, and there must be

*Judgment on the verdict.*